IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **BARBARA JEAN LAKE,** ) | |
| **OBO P.C.R, JR.** ) | |
|  ) | |
| Plaintiff, ) | |
|  ) | |
| v. ) | CASE NO. 7:08-CV-2204-KOB |
|  ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
|  ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Barbara Jean Lake filed an application on behalf of P.C.R., a minor, for Supplemental Security Income Payments on May 2, 2005, alleging disability as of May 2005 because of mental retardation, attention deficit hyperactivity disorder (ADHD), Osgood-Schlatter's Disease, and asthma. The Commissioner denied the claim on September 22, 2005.  The claimant filed a timely request for a hearing before an Administrative Law Judge.  The ALJ held a hearing on July 24, 2007.  In a decision dated October 18, 2007, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and therefore, was not eligible for  Supplemental Security Income Payments.  On July16, 2008, the Appeals Council denied the claimant's request for review.  The claimant has exhausted his administrative remedies, and is now ripe for review under 42 U.S.C. § 1383(c)(3), which incorporates § 405(g).  For the reasons stated below, the

1

decision of the Commissioner is REVERSED and REMANDED.

## II.  ISSUE PRESENTED

Whether the ALJ improperly rejected part of the claimant's treating physician's opinion.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standard and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Id.* at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirely to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirely and take account of evidence that detracts form the evidence relied

on by the ALJ, *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV.  LEGAL STANDARD

Under the authority of the Social Security Act, the Social Security Administration has established a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled.  (20 C.F.R. 416.924(a)).

At step one, the Commissioner must determine whether the claimant is engaging in substantial gainful activity.  Substantial gainful activity is defined as work activity that is both substantial and gainful.  An individual is engaging in substantial gainful activity if he is performing significant physical or mental activities for pay or profit.  (20 C.F.R. 416.972).  If the claimant is not engaging in substantial gainful activity, the analysis proceeds to the second step.

At step two, the Commissioner must determine whether the claimant has a medically determinable "severe" impairment or combination of impairments that is "severe."  For an individual who has not attained age 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  If the claimant does not have a medically determinable sever impairment(s), he is not disabled.  (20 C.F.R.416.924(c)).  If the claimant has a severe impairment(s), the analysis proceeds to the third step.

At step three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing, or that functionally equals the listings.  In making this determination, the Commissioner must consider the combined effect of all medically determinable impairments, even those that are not severe.

(20 C.F.R. 416.923, 416.924a(b)(4), and 416.926a(a) and (c)).  If the claimant has an impairment or combination of impairments that meets, medically equals or functionally equals the listings, and it has lasted or is expected to last for a continuous period of at least 12 months, he is presumed to be disabled.  If not, the claimant is not disabled.  (20 C.F.R. 416.924(d)).

In determining whether an impairment or combination of impairments functionally equals the listings, the Commissioner must assess the claimant's functioning in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (4) caring for oneself; and (6) health and physical well-being.  In making this assessment, the Commissioner must compare how appropriately, effectively, and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments.  To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  (20 C.F.R. 416.926a(c)).

According to well-established Eleventh Circuit law, the Commissioner must accord the opinions of the treating physicians with substantial or considerable weight, absent a showing of good cause for failing to do so.  *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).  If the ALJ decides to discount the opinion of the treating physician, he must "clearly articulate" his reasons for doing so.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  The ALJ must make clear the weight accorded to each item of evidence and the reasons for his decision so that the reviewing court may determine whether the decision is based on substantial evidence.  *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

**V.  FACTS**

Claimant was born on September 12, 1991, and was a school-aged child on the date the application was filed, May 2, 2005.  On May 12, 2005, the claimant's mother completed a Function Report indicating that claimant had limitations in his learning and comprehension at school; she stated that he had difficulty spelling words of more than four letters but that he could read and understand sentences and stories in comics, cartoons, books, magazines, and newspapers; could add, subtract, multiply and divide numbers over 10; could make correct change; and could understand, carry out, and remember simple instructions. (R. 59).

Dr. Maurice Fitzgerald, a family practitioner, had treated the claimant from January 22, 2001 to October 4, 2005 for serious otitis (ear inflammation), upper respiratory infection, Osgood-Schlatter's Disease (knee pain affecting children where the bony protrusion below the knee becomes inflamed), asthma, and potential attention deficit disorder.  (R. 102-14; 135-143).

Following his filing for benefits in May of 2005, claimant underwent a series of consultations and tests.  On July 23, 2005, Nina E. Tocci, Ph.D. performed a consultative psychological evaluation.  Dr. Tocci reported that on mental status examination, the claimant slouched in his chair; evidenced slowed motor activity; refused to speak in a conversational tone; and demonstrated poor eye contact, dull facial expressions, and an uncooperative attitude.   Dr. Tocci also noted that he demonstrated insight into his behavior, a fair fund of information, and fair comprehension.  Dr. Tocci administered the WISC (Wechsler Intelligence Scale for Children), 4th edition, and the claimant's full scale IQ score of 41 (100 is average) fell in the mentally retarded range.  However, Dr. Tocci considered the results of this test invalid because claimant showed signs of passive-aggressive response, lack of motivation to participate in the

test, and some of his test responses appeared to be deliberately fabricated. Dr. Tocci gave claimant a global assessment of functioning score of 65 (indicating some mild symptoms or difficulty in social, occupational or school functioning, but generally functioning pretty well) with no diagnosis. Dr. Tocci also stated that claimant appeared to be functioning in the low average range of ability. (R. 117-20).

On August 18, 2005, Dr. Patricia M. Sardusky, Ph.D., performed another consultative psychological evaluation. Dr. Sardusky reported that on a mental status examination, the claimant's behavior, psychomotor activity, thought processes, and thought content were within normal limits. His speech revealed no articulation disorder and his affect was unremarkable. Upon administration of the WISC test, 4th edition, the claimant received a full-scale IQ score of 62, indicating that his overall ability was within the mildly mentally retarded range. However, Dr. Sardusky reported that a great deal of variation existed in the composite scores of this test and further, that claimant's adaptive behavior appeared inconsistent with a diagnosis of mild mental retardation. She acknowledged that claimant had been found to be malingering on a previous test, and stated that although "he is considered to be putting forth considerably more effort today, his test scores are not consistent with a diagnosis of Mental Retardation." (R. 125). She did, however, diagnose claimant as having a learning disorder, not otherwise specified. (R. 121-25).

On September 20, 2005, Peter Bertucci, M.D., and William Simpson, Ph.D., both state agency doctors, completed a Childhood Disability Evaluation Form. With respect to the six domains, they found that the claimant had a less than marked limitation in the domain of acquiring and using information and that claimant had no limitation in the remaining five. They

found that although claimant's impairment or combination of impairments was severe, it did not meet, medically equal, or functionally equal the listings. (R. 126-132).

On September 22, 2005, Ernestine Thomas, a resource teacher at The Psychological Corporation, gave an interpretive report of a Wechsler Individual Achievement Test that she administered to claimant. His composite scores were: Reading - 55 (better than only 1% of students his age); Mathematics - 70 (but great variability existed, so a composite score does not adequately summarize; the sub-scores were Math Reasoning 83, but Numerical Operations 65); Language - 102 (average); Writing - 51 ( better than only 1% of students his age). (R. 146-48).

A hearing screening form completed on October 3, 2005 reflected that claimant's hearing and vision were within normal limits. Also in early October, Fitz-Gerald and Perret Clinic conducted a Health Supervision Visit that included a note documenting claimant's complaints about problems concentrating at school; the examiner referred claimant to Behavioral Medicine in Selma for follow-up. (R. 137).

On October 19, 2005, Roger D. Hunter, a licensed professional counselor, performed a psychological/educational evaluation called a Universal Nonverbal Intelligence Test (UNIT) on claimant for the Sumter County Board of Education. Determining the test to be valid and reliable and claimant to be cooperative with good motivation and good effort, Dr. Hunter gave claimant a full scale IQ score of 85 with low average range of cognitive abilities. He concluded that claimant should be successful in a mainstream classroom. (R. 143-44).

On November 8, 2005, Richard S. Reynolds, Ph.D. at Behavioral Medicine in Selma, performed a psychological evaluation on claimant. Dr. Reynolds noted the following report from claimant's mother: claimant had significant problems in school, including failing to pay close

attention to detail, difficulty sustaining attention, failing to listen carefully, fidgeting, and being distracted easily by extraneous stimuli. Dr. Reynolds stated that claimant's mental status exam revealed that he was alert, oriented, and cooperative with normal speech patterns and affect, logical thought content, intact remote and recent memory.  He noted reports of claimant's behavioral issues, including two suspensions, as well as trouble at school for laughing and playing.  Dr. Reynolds provided a diagnosis of  "Axis I: Attention Deficit Hyperactivity Disorder; Axis II: Rule Out Mild Range of Mental Retardation; Axis III: Deferred; Axis IV: Absence of father, poor adjustment to school; Axis V: Current GAF 60 to 65; highest GAF past year 65." (R. 163).  Dr. Reynolds recommended psychological testing, family therapy to address behavioral issues and medication evaluation.  (R. 162-3).

Follow-up records indicate that on November 17, 2005, claimant's mother brought to Behavioral Medicine copies of school testing results for Wechsler Achievement Test, Thematic Apperception Test, and Kinetic Family Drawing.  Claimant did not return to Behavioral Medicine during the next year and a half.  (R. 161).

On June 7, 2007, Nurse Practitioner Gayla Culpepper treated claimant and diagnosed mild, persistent, uncontrolled asthma despite his use of an Albuterol inhaler and Prednisone.  (R. 156).

On June 18, 2007, Behavioral Medicine personnel administered to claimant the WISC test, 4th edition.  Claimant received a full-scale IQ score of 56, scoring higher than only 2% of the children his age, and falling within the mild mental retardation level, if valid.  On June 21, 2007, Behavioral Medicine personnel administered to claimant the Wide Range Achievement Test, but the score on that particular test is unreadable and the record does not explain the results.  On June

27, 2007, Dr. Reynolds met with claimant to discuss the results of the test, and his progress notes indicate a diagnosis of mild mental retardation. (R. 161). On July 19, 2007, Dr. Reynolds met with claimant to discuss his disrespectful behavior and consequences of such behavior. (R. 161).

*Hearing before the ALJ*

On July 24, 2007, the claimant submitted new exhibits that included a list of medications, medical records dated June 7, 2007 from Dr. Fitzgerald, and Behavioral Medicine treatment notes covering the period from November 8, 2005 to July 19, 2007. The claimant's mother testified that her son failed the 5th grade and "tested in special ed," receiving extra help when needed. She identified his main problems as asthma, a learning disability, and Osgood-Schlatter's disorder. According to claimant's mother, his asthmatic condition requires him to take Albuterol through a nebulizer four times daily, which makes him sleepy. It limits his activities such as playing ball, but it has not recently resulted in hospitalizations or emergency room visits. The Osgood-Schlatter's disorder causes him to limp and to suffer from "a lot of pain" in his knee." (R. 188). As to claimant's learning problems, she testified that he had received treatment from Behavioral Medicine for behavior and "poor learning." (R. 188). Although the attorney pointed out that claimant had received a diagnosis of ADHD, claimant's mother acknowledged that he had received no prescription for related medication, but that she planned for the claimant to follow up with a psychiatrist.

Claimant's attorney also pointed out that the recent Behavior Medicine records reflected a full scale IQ test score of 56, but that the recent WRAT scores were unreadable. He promised to try to submit a readable copy of the WRAT scores, but the record does not reflect that he was able to do so. (R. 184-190).

*The ALJ's Opinion*

On October 18, 2007, the ALJ issued an opinion finding that claimant was not disabled within the meaning of the Social Security Act. He found that claimant was a school-aged child on the date the application was filed and had not engaged in substantial gainful activity at any time relevant to the disability determination. He concluded that claimant had the following severe impairments: asthma, ADHD, learning disorder, and Osgood-Schlatter's Disease.

The ALJ determined, without explanation, that claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.

He further determined that claimant did not have an impairment or combination of impairments that functionally equaled one of the listed impairments. He first listed claimant's subjective symptoms and included in that subjective list the testimony of claimant's mother that her son had received a full-scale IQ score of 56. Calling into question the *testimony* about this score, the ALJ pointed to claimant's other IQ tests submitted: the WISC score of 62 on the test that Dr. Sandusky administered in August of 2005 and noted a great deal of variability in composite scores and the inconsistency with claimant's adaptive behaviors; and the UNIT test administered in October of 2005 and resulting in a full scale IQ of 85. The ALJ's opinion did not acknowledge that the mother's testimony regarding the IQ score of 56 was substantiated by Dr. Reynolds' records produced at the hearing. He did not assign specific weight to Dr. Reynolds's diagnosis of mild retardation based on the IQ test or explicitly reject Dr. Reynolds's opinion.

The ALJ found that other reports further contradicted claimant's claims about his IQ and mental functioning. He noted the May 12, 2005 function report in which claimant's mother acknowledged that he could read and understand books and other material and could do math

10

calculations with numbers over 10.  He further noted that claimant "is not in a structured or highly supportive setting, does not require special adaptations, is not in therapy, and does not require special treatments or interventions."  (R. 20).  Concluding that claimant's impairments were not so severe as to preclude age-appropriate functioning, the ALJ also found that his subjective complaints were "unsupported by objective medical and other evidence to the extent alleged" and were not entirely credible.  (R. 20).

The ALJ proceeded to analyze claimant's function based on the six domains of function. He found that claimant had a marked limitation in acquiring and using information; a less than marked limitation in attending and completing tasks; a less than marked limitation in health and physical well-being; and no limitation in the other domains. Based on these findings that the claimant had "marked" limitations in only one domain and no "extreme" limitations, the ALJ concluded that claimant was not disabled within the meaning of the Social Security Act. (R. 20-25).

## V.  DISCUSSION

Claimant argues that the ALJ ignored the treating physician's diagnosis of mental retardation, substantiated by a full scale IQ test score falling within listing limits, and thus, failed to properly consider the claim under Childhood Listing 112.05C.  That listing provides as follows:

> **112.05 Mental Retardation:** Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.  The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
> . . .
> C.  A valid verbal, performance, or full scale IQ of 59 or less . . . .

Dr. Reynolds, claimant's treating psychologist, ordered WISC IQ testing and, based on the testing results of a full scale IQ of 56, made an explicit diagnosis of mild mental retardation. Claimant asserts that the ALJ should have given substantial weight to this opinion of claimant's treating physician and found that claimant met the listing based on the score and diagnosis. Alternatively, claimant asserts that the ALJ should have specified the weight he gave to the treating physician's opinion and specified what good cause he had for rejecting it.

The court looks first to the law in this circuit to determine whether the ALJ met his legal obligations. The Eleventh Circuit has established that the Commissioner must accord the opinions of the treating physicians with substantial or considerable weight, absent a showing a good cause for failing to do so. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). If the ALJ decides to discount the opinion of the treating physician, he must "clearly articulate" his reasons for doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). The ALJ must make clear the weight accorded to each item of evidence and the reasons for his decision so that the reviewing court may determine whether the decision is based on substantial evidence. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

In the instant case, claimant provided the ALJ with Dr. Reynolds's records, which included a WICS IQ test with a score of 56 and a resulting diagnosis of mild mental retardation. His attorney specifically advised the ALJ of the 56 IQ test score. In his opinion's synopsis of Dr. Reynolds's records, the ALJ acknowledged receiving Behavioral Medicine records through July 19, 2007, which would include the WICS IQ test results as well as Dr. Reynolds's June 2007 diagnosis. However, the ALJ ignored that score and that diagnosis, and he treated the testimony of claimant's mother regarding that score as if it were an unsubstantiated, subjective allegation. In

completely ignoring that portion of Dr. Reynolds's report, he failed to assign a specific weight to it, to explicitly reject it, or to articulate his reasons for the rejection.  In so doing, he erred and disregarded Eleventh Circuit law.  Because the ALJ failed to explain the reasons for his rejection of this crucial part of the treating physician's opinion, and thus, failed to provide "good cause," the court cannot determine that the ALJ's opinion is based on substantial evidence.

## VI.  CONCLUSION

For the reasons stated above, the court concludes that substantial evidence does not support the Commissioner's decision.  Therefore, the court will REVERSE and REMAND the decision to determine whether the claimant is entitled to Supplemental Security Income payments.  The court will enter a separate Order consistent with this opinion.

Dated this 30th day of March, 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE